UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION



**FILED**

NOV 2 1 2012

CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| ROBERT B. MONLUX | * | CIV. 11-4180 |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| -vs- | * | REPORT and RECOMMENDATION |
|  | * |  |
|  | * |  |
| MICHAEL J. ASTRUE, | * |  |
| Commissioner of Social Security, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff, Robert B. Monlux ("Monlux") seeks judicial review of the Commissioner's final decision denying him a period of disability commencing on November 30, 2006, and payment of disability insurance and medical benefits under Title II and/or Title XVI of the Social Security Act.[1] Monlux has filed a Complaint and has requested the Court to enter an order instructing the Commissioner to award benefits. Alternatively, Monlux requests a remand to the agency pursuant to 42 U.S.C. § 405(g) sentence four, for further consideration. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED AND REMANDED for an immediate award of benefits.

---

[1] SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified-- is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, Monlux filed his application for both SSD/DIB and SSI benefits. He protectively filed his application for both types of benefits on December 12, 2006. AR 15, 95-109. Monlux's "date last insured" for SSD/DIB ("Title II") benefits is December 31, 2011. *See* AR 17, 110.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and Judge Schreier's Standing Order dated March 18, 2010.

## ADMINISTRATIVE PROCEEDINGS

Monlux protectively filed his application for benefits on December 12, 2006.[2] AR 15, 95-109. In an undated form entitled "Disability Report–Adult" he filed in connection with his 2006 disability application (AR 126-33) Monlux listed the following as illnesses, injuries or conditions that limited his ability to work: "traumatic arthritis ankles, severe chronic pain and pressure pain, atrophy left foot, 5 toes left foot, hammertoes with no movement, 20% mobility left ankle, 40% mobility right ankle, worsened last year." AR 127. He explained that these conditions limit his ability to work in the following ways: "Pain related–difficulty walking, being on feet for any extended time. My pain level goes up when I am on my feet for over an hour. Now pain in knees and hips." *Id.*

Monlux's claim was denied initially May 21, 2007 (AR 60-62), and on reconsideration on June 19, 2007 (AR 70-74). He requested a hearing (AR 75-77) and a hearing was held on October 22, 2008, before Administrative Law Judge (ALJ) the Honorable Robert Maxwell. AR 24-55. On December 24, 2008, the ALJ issued a nine page, single-spaced decision affirming the previous denials. AR 15-23. On February 17, 2009, Monlux's attorney[3] requested a review of the ALJ's decision by the Appeals Council. AR 7-8. The Appeals Council received as additional evidence: medical records from Falls Community Health and US Department of Labor Certification of Health

---

[2]The protective filing date is the date a claimant first contacts the Social Security Administration about filing for benefits. It may be used to establish an earlier application date than when the Administration receives the signed application. *See* http://www.ssa.gov/glossary.htm

[3]Plaintiff was not represented by Mr. Pfeiffer at the administrative level.

Care Provider (AR 4, 232-244, 245-251). Additional evidence was offered (AR 221-31) but for reasons which are not explained, the Appeals Council did not consider it. The Appeals Council denied review of Monlux's claim on September 10, 2010. Monlux then filed a Complaint in this Court. *See Monlux v. Astrue*, Civ. 10-4161. Upon initial review of that civil action, the Commissioner agreed an error had been committed by the Appeals Council by failing to review all of the evidence submitted. A request for remand was made for further administrative action. Judge Schreier entered an Order remanding the case back to the Social Security Administration for further review. AR 257-59. On November 14, 2011, five years after Monlux filed his claim, the Appeals Council again denied review, rendering the ALJ's 2008 decision the final decision of the Commissioner.

Monlux then filed the instant Complaint with this Court, again seeking review of the Commissioner's denial of benefits. Now, six years after Monlux initially filed his claim, for the reasons more fully explained below, the Court respectfully RECOMMENDS the decision of the Commissioner be REVERSED and that benefits be immediately awarded.

## **FACTUAL BACKGROUND**

Robert Monlux was born in 1955 and was fifty-two years old at the time of the administrative hearing. AR 27.[4] He graduated from high school in 1974. AR 28. He has some college credit hours but has no further certificates or degrees.

Monlux suffered two traumatic injuries which are the basis for his claim for disability benefits. The first injury occurred in approximately 1988 when he was helping a friend shingle a roof and he fell off, landing on concrete.[5] He crushed both his left and right calcaneus (heel bones).[6]

---

[4]Pursuant to 20 C.F.R. Pt. 404 Subpt. P. App. 2, Medical Vocational Guidelines, § 201.00(g), Monlux was "approaching advanced age" (50-54) on the date of his administrative hearing, his date last insured, and the date of his alleged onset.

[5]Monlux did not mention the date of the injury during his hearing testimony, but the medical records indicate it occurred in approximately 1988.

[6] http://medical-dictionary.thefreedictionary.com/calcaneus

AR 29. He also broke both ankles which necessitated an external reduction surgery on the right and external and internal reduction surgery on the left. AR 29-30. The second injury occurred when he stepped off a curb and fractured his left tibia and fibula. AR 29. He has metal plates in both of those bones on his left side. He describes the joint at his left foot as "basically frozen up." *Id.*

Before his fall from the roof, Monlux was a letter carrier for the United States Postal Service. AR 140, 170, 193. After his injury and until he quit working, however, he did phone work so that he could stay off his feet. AR 28. Monlux's final job was as a collections agent in the call center at HSBC. AR 41, 134. Monlux last worked in November, 2006. He quit his job at HSBC because the arthritic pain and swelling caused by his traumatic injuries progressively bothered him more and more. AR 30.

### Medical Conditions and Treatment

The medical records which appear in the administrative records are summarized by provider.

### 1. Sioux Valley Clinic n/k/a Sanford Clinic (Paula Adam-Burchill) 7/06-9/08)

Monlux testified at hearing that Dr. Paula Adam-Burchill had been his primary care physician for twenty years. AR 45. The medical records contained in the administrative record, however span only from July, 2006 through September, 2008.

Monlux saw one of Dr. Adam-Burchill's partners, Dr. Hruby, on July 21, 2006. AR 185. On that date, Monlux complained of lower extremity swelling and a "fair amount of pain." He requested a refill of hydrochlorothiazide,[7] which had apparently been earlier prescribed by an Acute Care physician. Monlux told Dr. Hruby that Dr. Adam-Burchill was his physician, but Dr. Hruby noted Monlux had not seen Dr. Adam-Burchill in over five years. *Id.* Dr. Hruby noted Monlux's blood pressure was significantly elevated and that his lower extremities were both swollen, left greater than right. Dr. Hruby restarted the hydrochlorothiazide with strict instructions to follow up

---

[7] Hydrochlorothiazide is a diuretic and anti-hypertensive. Www.drugs.com/hydrochlorothiazide.html.

with Dr. Adam-Burchill. *Id.*

Monlux followed up with Dr. Adam-Burchill on August 21, 2006. AR 184. At that time, he was working for HSBC. He reported gaining approximately forty pounds in the past year because of stress related to caring for his mother who had recently died of colon cancer. He reported an inability to exercise because of his history of leg fractures on both sides. *Id.* He also reported a recent repeated leg fracture on the left side after stepping off a curb. He reported to Dr. Adam-Burchill that if he went golfing he would "pay for it" the next day. AR 183. He also reported missing work occasionally because of his leg discomfort. He asked Dr. Adam-Burchill to complete some FMLA paperwork so that he would not be penalized if he missed work because of his leg condition. AR 183.[8] Dr. Adam-Burchill noted Monlux was obese, at 288 pounds. *Id.*[9] She diagnosed him with hypertension, lower extremity edema, obesity, and tobacco use. AR 183. She prescribed Lisinopril[10] and while she recognized that his exercise options were limited because of his leg problems, she "strongly encouraged" him to lose weight. AR 183.[11] She also "strongly encouraged" him to quit smoking. *Id.*

On September 6, 2006, Dr. Adam-Burchill completed a form certifying that Monlux's severe arthritis secondary to his fractured ankle qualified as a "serious health condition" pursuant to the Family and Medical Leave Act. AR 249-251. This form was not available to the ALJ but was available to the Appeals Council on its first review. AR 4, 232. Dr. Adam-Burchill explained that Monlux may miss work on occasion due to severe pain and that the duration of his condition was indefinite.

Monlux returned as instructed in October, 2006. AR 182. His blood pressure was improved

---

[8]These forms appear in the record at AR 249-51.

[9]At the hearing , Monlux testified he is 5 feet 7 and ½ inches  tall.  AR 42.

[10]Lisinopril is an ACE inhibitor indicated for hypertension (high blood pressure). www.rxlist.com

[11]There is no indication in the record whether Monlux was obese before his bilateral ankle/heel fractures occurred.

but still not under adequate control. Dr. Adam-Burchill advised him to decrease the amount of caffeinated soda he regularly consumed. *Id.* She noted his ankle fractures had left him "somewhat disabled." *Id.* She also noted that although exercise was difficult he'd lost three pounds since his last visit. She increased his Lisinopril dosage, encouraged him to modify his diet and exercise, and return in six weeks. *Id.*

Monlux returned to see Dr. Adam-Burchill in December, 2006. She noted his blood pressure was better and that he'd been monitoring it on a weekly basis. AR 181. He continued to smoke but he'd been taking medication (TriCor)[12] for high cholesterol. *Id.* Dr. Adam-Burchill again encouraged him to quit smoking. AR 181. Monlux wished to talk about his ankle problems and Dr. Adam-Burchill noted he'd fractured both heels approximately eighteen years ago when he fell off a roof, as well as re-fracturing his left ankle more recently. She noted:

> [H]e really is debilitated. Just simple activities of daily living are difficult for him. For instance if he has a very active day or even attempts to play a round of golf while riding around in a golf cart, he cannot walk for the next two days. He was on his feet for about four to five hours the past weekend sporadically and when he had to get up to use the bathroom at night, he had to crawl because his ankles get so locked up.

AR 181. Dr. Adam-Burchill's examination revealed an obese abdomen and skin changes on the lower extremities. She noted he had two plates in his left ankle and contracture type deformities of the foot because of the limited and lack of mobility of the ankle. The right ankle moved better than the left but dorsiflexion and plantar flexion are "extremely minimal." Dr. Adam-Burchill also noted edema. AR 181. She diagnosed hypertension, high cholesterol, and bilateral heel fractures "with resultant disability." *Id.* She noted he'd quit his job at HSBC "because he is just unable to keep up. He has applied for disability, which I think is probably the only way he would be able to make it through." *Id.* Dr. Adam-Burchill continued Monlux's Lisinopril, increased the dosage of his Hydrochlorothiazide, and gave him some samples of TriCor for the next few months. She asked him to return at that time. On February 14, 2007, Monlux failed to show up for his appointment with Dr. Adam-Burchill. AR 180.

---

[12]TriCor is a lipid regulating agent indicated as an adjunctive therapy to diet to reduce elevated low density lipoprotein (LDL) cholesterol, total cholesterol, triglycerides, and to increase high density lipoprotein cholesterol (HDL) in adult patients with primary hypercholesterolemia.  www.rxlist.com

On September 8, 2008, Dr. Adam-Burchill wrote a "To Whom it May Concern" letter which was contained in the administrative record considered by the Administrative Law Judge. AR 217. Dr. Adam-Burchill opined that although Monlux had been able to work for the past twenty years since the injury that caused his multiple fracture injuries, "he is now finding it difficult to take care of his daily needs due to te excessive arthritic changes and immobility of his extremities. In my opinion, it would be a hardship for him to continue to be employed as simply walking any distance is difficult at best." Id. Dr. Adam-Burchill invited questions at the close of her correspondence. Id. A few days later, Dr. Adam-Burchill completed a questionnaire which was also considered by the ALJ. AR 219. The form indicated Dr. Adam-Burchill believed Monlux's pain would frequently interfere with his concentration and attention to work tasks, that he could sit for a maximum of 2 hours before needing to get up, stand for a maximum of 15 minutes before needing to sit down, sit for a total of two hours in an 8 hour work day, and stand/walk for less than 2 hours in an 8 hour work day, and carry less than ten pounds on an occasional basis. Id.

Dr. Adam-Burchill's office notes for September, 2008 were not included in the administrative record which was available to the ALJ, but they were submitted to the Appeals Council for review. AR 221-231, 261-271.[13] Dr. Adam-Burchill saw Monlux on September 8, 2008 for bilateral leg pain. AR 226. She recited his history of old injuries resulting from a fall off a roof, resulting in bilateral crushed calcaneus, bilateral broken ankles, and surgery and the

---

[13]These are among the records which were not considered by the Appeals Council on its first review, but were considered by it on its second review. See AR 4, 221, 256. In cases involving submission of supplemental evidence subsequent to the ALJ's decision, the record may include evidence submitted after the hearing and considered by the Appeals Council. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). "In practice, this requires [the court] to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." *Id.* 20 C.F.R. § 404.970(b) requires the Appeals Council to consider additional evidence submitted only if it is new, material, and *"relates to the period on or before the date of the administrative law judge hearing decision . . ."* The date of the medical examination is not dispositive of whether the evidence is material, but rather whether the information contained in the submitted records relates to the claimant's condition during the relevant time. *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990).

University of Minnesota. *Id.* She also recalled his second surgical procedure on the left leg "to put in supports per Dr. Bell." *Id.* She also noted arthritis in both knees. Monlux reported he'd quit his job at HSBC and that although he was able to take care of his daily needs he was very unsteady on his feet and often resorted to crawling to the bathroom in the mornings. AR 226. Dr. Adam-Burchill commented that Monlux had been through a Sanford pain clinic on a referral from Dr. Bell, but she did not have the records. Although Monlux continued to work immediately after his injury, he had come to "the end of his rope." *Id.* He discontinued chronic pain medication because he disliked the way it made him feel and he quit drinking. Her objective exam showed no edema, but scars on the lower extremities due to his surgeries. Dr. Adam-Burchill noted Monlux was obese, weighing 297 pounds. His range of motion was "minimal" especially on the left. Dr. Adam-Burchill diagnosed progressive arthritic changes in the lower extremities. AR 226. She encouraged him to take his blood pressure medication more regularly and, despite his limited mobility, to "optimize his diet as best as possible and work on weight loss." AR 227.

### 2.  Van Demark Orthopedic Specialists (Dr. William Bell) 11/03

Dr. Bell's records were not available to the ALJ but were reviewed by the Appeals Council on its second review. *See* AR 4, 221, 256. [14] Dr. Bell performed the surgical procedure when Monlux broke his left tibia/fibula in 2002. AR 129. Monlux returned for a re-check with Dr. Bell in November, 2003. AR 220. He reported doing "pretty well" but still having some discomfort and swelling with obvious synovitis in the ankle. He reported being ambulatory without any assistive device although he was often stiff in the mornings. Dr. Bell's physical examination revealed ankle swelling. *Id.* X-rays showed a healed tibial pilon fracture with significant subtalar arthritis on both

---

[14]These records pre-date Monlux's alleged date of onset. The Social Security regulations require the Commissioner to consider all evidence submitted by a claimant when making the disability determination. 20 C.F.R. § 404.1520(a)(3). While medical evidence which predates the alleged date of onset "is of little relevance" *Carmickle v. Commissioner of Social Security Administration*, 533 F.3d 1155, 1165 (9th Cir. 2008), failure to consider it at all may be reversible error. *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008). Medical records which pre-date the alleged date of onset are properly considered not for the purpose of determining whether Monlux is disabled during the relevant time period, but to provide a more accurate understanding of his medical background. *See e.g. Walker v. Astrue*, 2012 WL 369453 at *1 (S.D. W.Va.).

sides. Dr. Bell prescribed Prednisone[15] for two weeks. Dr. Bell renewed the prescription for an additional two weeks on December 3, 2003. Monlux requested another refill on December 24, 2003 but it was refused pending another office visit. *Id.*

On November 15, 2003, Dr. Bell completed a form for purposes of certifying Monlux's heel/ankle and leg fractures with resultant arthritis as a "serious health condition" which may require FMLA leave. AR 245-247.[16]

### 3.    Falls Community Health 12/08 - 5/09[17]

Monlux first visited Falls Community Health in December, 2008. AR 236. The reason for his initial visit was to check on his high blood pressure and ankle pain. AR 236. He reported he'd been prescribed medication for his high blood pressure but had not taken it for quite some time. He complained of pitting edema if he was on his feet during the day, which subsided during the night. He also complained of chronic arthritis for which he used over the counter ibuprofen. He reported that he'd been to a pain clinic and had at one time used prescription narcotic pain medication but discontinued it because he did not like the "high" feeling from that medication. AR 237. Monlux requested assistance in obtaining a tripod cane or walker. *Id.* He also requested assistance in getting his handicap parking tag renewed. He reported he'd quit smoking but continued to use chewing tobacco. The nurse practitioner prescribed Tramadol[18] and Hydrochlorothiazide. She also provided a consult to help him find a walking assistive device. AR 238. She renewed his handicap parking

---

[15]Prednisone is a steroid indicated for several conditions including post-traumatic osteoarthritis. www.drugs.com

[16]These FMLA forms were not available for the ALJ but were considered by the Appeals Council on its first review. AR 4, 232.

[17]Falls Community Health is a health clinic run by the City of Sioux Falls. Its "mission is to be an open door to quality health care services by removing barriers, especially financial, that exist for working families without health insurance or other resources to meet their health care needs." http://www.siouxfalls.org/FCH.aspx

[18]Tramadol is an analgesic indicated for the management of acute pain. www.rxlist.com

permit[19]  Monlux was instructed to return for follow-up in one month.  *Id.*

Monlux returned to Falls Clinic in January, 2009 for lab work.  AR 236.  Monlux's blood sugar and cholesterol levels were abnormal.  AR 243-244.  In February, 2009, Monlux returned to review the results of the lab work.  AR 234.  He reported he'd not taken his Tramadol as directed because it disturbed his sleep and made him feel "goofy and weird." He admitted taking his blood pressure medication irregularly.  He had not been able to find a used device to assist him in walking so he requested a prescription to help him get one.  *Id.*  The nurse practitioner assessed hypertension, asymptomatic hyperuricernia, obesity and chronic pain.  AR 235.  She suggested Monlux reduce the Tramadol dosage to cut down on the side effects.  She encouraged him to take his blood pressure medication regularly and encouraged him to improve his diet and exercise in an effort to improve his blood sugar numbers.  Monlux's last appointment at the Falls Clinic was on May 14, 2009, when he received a renewal of his blood pressure medication.  AR 234.

### 4.    Center for Family Medicine (Dr. Allison Geier, State Agency Consultative Examining Physician) 4/07

On April 23, 2007, Monlux was examined by  Dr. Allison Geier at the request of South Dakota Disability Determination Services.  AR 193.  She noted his bilateral calcaneal fractures eighteen years ago from a fall off a roof which necessitated a change from his previous job as a postal worker to "inside work." *Id.* "He has had chronic pain and worsening of his symptoms since then with some social issues." *Id.*  Dr. Geier noted Monlux turned to alcohol to medicate his pain but had been sober for six weeks.  AR 193.  Monlux rated his pain regularly at 4/10 but 10/10 with even minimal activity.  He reported taking fifteen to twenty Motrin tablets on a bad day.  He tried narcotic pain medications in the past including Lortab and Oxycontin.  *Id.*  Monlux reported that his morning routine, including a thirty minute bath to get his legs moving and an additional half hour to get ready in the morning sometimes caused him to be late for work.  *Id.*  He also reported that sitting for long periods of times caused his legs to swell and be painful.  Recreational activities such

---

[19]The paperwork for the handicap parking permit is found at AR 240 and indicates Monlux's handicap is permanent.

as golfing caused him to be "laid up with pain." *Id.* He also reported knee and hip pain on the left which he attributed to the altered gait caused by his ankle problems. *Id.*

Dr. Geier's physical examination revealed that Monlux weighed 293 pounds and was 5 feet 8 and ½ inches tall. AR 194. She described him as "somewhat obese." His left foot and ankle showed scars and slight pigment changes but no significant swelling was present in either foot. AR 194. His gait was irregular. His range of motion was affected because he had no dorsiflexion in either foot and his plantar flexion was five degrees on the left and ten degrees on the right. He could not invert or evert either foot nor could he pronate or supinate either foot easily. He was tender along the peroneal tendons bilaterally. Dr. Geier could not evaluate the posterior tibialis due to his limited range of motion. Monlux was unable to perform various stress tests due to his limited range of motion. AR 194.

Dr. Geier ordered x-rays of Monlux's ankles. The radiologist's report indicates "severe talonavicular degenerative change with large osteophytes as well as complete bone effusion of the calcaneus to the talus. Differentiation of the bones is not well seen. Osteophytes about the medial and lateral malleoli are also demonstrated." AR 195. On the right ankle the radiologist noted "there is severe flattening of the Boehler's angle and evidence of previous calcaneal fracture with increased sclerosis throughout the calcaneus and suggestion of subtalar severe degenerative change with subchondral sclerosis between the talus and the calcaneus. Small osteophytes about the tibia and fibular are also seen. Talonavicular joint is well preserved on the right." AR 195.

Dr. Geier's assessment was the Monlux's bilateral ankle pain "significantly decreased range of motion which has affected the patient's ability to function in daily life significantly. . . .Currently the patient is unable to work for 8 hours without significant pain. One would wonder if being in the pain clinic to try and control this might help. He certainly cannot do any jobs that involve standing for long periods of time. The ability to stoop, climb and kneel are significantly impaired secondary to decreased range of motion. He is able to see, hear and speak easily. Travel would be questionable depending on how far he has to walk. Work with exposure to dust, fumes, temperature changes and

hazards is not applicable." AR 194.

5.    **Residual Functional Capacity Assessment, Non-Treating, Non-Examining Physicians(Dr. Frederick Entwistle 5/07, Dr. Gregory Erickson, 6/07)**

Dr. Frederick Entwistle completed a Residual Functional Capacity Assessment on May 14, 2007. He did not examine or treat Monlux. AR 199-206. Dr. Entwistle indicated he reviewed Dr. Geier's evaluation dated April 23, 2007 and Dr. Adam-Burchill's records. Dr. Entwistle also made reference to Monlux's Function Report-Adult dated April 7, 2007 which is found at AR 142-150.

Dr. Entwistle opined Monlux could lift/carry 20 pounds occasionally and 10 pounds frequently. He indicated Monlux could stand/walk 2 hours out of an 8 hour work day.[20] He indicated Monlux could sit about 6 hours out of an 8 hour work day, and that his operation of hand/foot controls was unlimited. He further opined that Monlux's postural, manipulative, visual, communicative, or environmental limitations were as follows: climbing ramps and stairs , balancing, stooping, and crouching were limited to occasionally and climbing ladders, ropes and scaffolds and kneeling, and crawling were limited to never. Dr. Entwistle assigned no manipulative, visual, communicative, or environmental limitations AR 200-203. In the narrative portion of his report, Dr. Entwistle noted Monlux's history of bilateral calcaneal fractures. AR 200.

> He stated on 4-07-07 that his personal care takes longer but he appears to have no significant difficulty in completing his tasks. He states he lives alone. Makes his own meals, does his laundry, some dishes and short periods of yardwork. He drives a car and goes shopping. He states he goes fishing 3x a year if he has help. Says he can walk 50 yards before having to rest for a couple of minutes.

> Review of the medical records notes history of and treatment for hypertension, medical note of 8-21-06 mentions "lower extremity edema, much improved on HCTZ." Records also mentions "Tobacco abuse.", and as of 12-13-06 he continued to smoke.   Medical evaluation noted height of 68-1/2 inches and weight of 293 pounds on medical exam of 4-23-07 no mention of any abnormalities or problems with upper extremities–feet revealed no edema. Peripheral pulses palpable. Marked restriction of ankle and subtalar motion [inversion and eversion].

---

[20]In a separate section of the form, Entwistle indicated Monlux should be able to stand/walk for 4 hours out of an 8 hour work day with normal breaks. AR 206.

X-ray reports of the ankles revealed severe degenerative changes left ankle and of the calcaneal-talus joint [patient had a history of left ankle fracture with ORIF some time after the previously mentioned bilateral calcaneal fractures]. The right ankle revealed a suggestion of severe degenerative changes between the talus and calcaneus.

AR 200-201. Dr. Entwistle acknowledged there were treating and/or examining source statements regarding Monlux's physical capabilities in the file, but denied those statements were significantly different from his own findings. AR 205.

On June 14, 2007, Dr. Gregory Erickson completed another Functional Capacity Assessment. AR 209-216.[21] Dr. Erickson did not treat or examine Mr. Monlux. Dr. Erickson opined Monlux could lift/carry 20 pounds occasionally and 10 pounds frequently. He indicated Monlux could stand/walk 2 hours out of an 8 hour work day. He indicated Monlux could sit about 6 hours out of an 8 hour work day, and that his operation of hand/foot controls was limited in the lower extremities. He further opined that Monlux's postural, manipulative, visual, communicative, or environmental limitations were as follows: climbing ramps and stairs, balancing, kneeling, crouching and crawling were limited to occasionally and climbing ladders, ropes and scaffolds and climbing ladders, ropes and scaffolds was limited to never. Dr. Erickson opined Monlux could frequently stoop. Dr. Erickson assigned no manipulative, visual, communicative, or environmental limitations except to avoid concentrated exposure to vibration and moderate exposure to hazards such as machinery and heights. AR 209-216. In the narrative portion of the report, Dr. Erickson explained:

> The claimant is a 51 year old male with a history of traumatic foot and ankle injury from a fall 18 years ago. He has had a distant surgical intervention and fixation. There has been a loss of motion of the ankle and chronic pain in the feet. Recent CE[22] confirms loss of motion. Recent x-rays show severe degenerative changes of the tarsal bones.

> The claimant lives independently. He does all his own ADLs on a slower basis. He does light household duties, cooking and lawn care in short time intervals. He sates he can ambulate 50 yards, leave the house on his own, and drive a car. The claimant

---

[21]Dr. Erickson was asked to review Monlux's Functional Capacity upon Monlux's initial request for reconsideration. The referring agent expressed the opinion that Monlux met or equaled the listing for 1.02 (Major dysfunction of a joint due to any cause).

[22]Consultive Exam

would be able to stand or walk 2 hours a day with frequent breaks and position changes. He has loss of range of motion and pain in the ankles and feet that would [sic] his ability to use foot pedals.

The claimant has mild hypertension and is on medication. Compliance with medications may be a factor in blood pressure control.

The claimant has a history of alcohol dependency. It was reported that he had been sober for a few weeks at this time. He still smokes daily. There is some question of narcotic misusage with using other people's pain medications.

AR 210-211.

Dr. Erickson acknowledged Monlux had decreased range of motion and severe degenerative changes to his feet, but believed his subjective limitations and pain "appear to be somewhat out of proportion to the physical findings." AR 214. Dr. Erickson acknowledged the treating and examining source statements in the file, but denied they were significantly different than his own. AR 215.

### Hearing Testimony

Monlux and a vocational expert (William Tucker) testified at the administrative hearing which was held on October 22, 2008. Monlux was fifty-two years old on the day of the hearing. AR 27. He completed high school and some college but did not have any advanced degrees. AR 28.

Monlux explained he'd been doing phone work for a number of years because he could not be on his feet. *Id.* He estimated he sat four or five hours a day and was allowed to move around for his breaks and on his lunch period. AR 29.

Monlux described the injuries that are the basis for his disability claim. AR 29. He fell off a roof and landed on concrete, crushing both his heels. He had an external reduction surgical repair of the right and external and internal reduction surgical repair of the left ankle. Then, five years before the hearing he stepped off a drop off and shattered his left tibia and fibula. *Id.* He has plates in the bones of his left leg and foot; he described the joint as "frozen up." AR 29. At the time of

the hearing, he was five feet, seven and a half inches tall and 290 pounds. AR 42.

Monlux worked until November, 2006. AR 30. His legs progressively bothered him more. He was getting up in the middle of the night and had to crawl to the bathroom. His legs were swollen from not being able to elevate them and his sleep pattern was altered. AR 30.[23] His legs would swell and he got burning sensations and pain in his legs and feet. AR 30-31. He attributed those symptoms to the arthritis in his ankles. AR 31. He was only sleeping for an hour and a half at a time. AR 30-31. Sometimes he needed to soak in a hot tub for an hour just to get enough stability to get to work. AR 31. It finally struck him that he needed to do something different if he was going to be able to continue to take care of himself. AR 30. The next morning he went to work and turned in his badge and filed for disability benefits. It was humiliating. *Id.*

Monlux also described problems with his knees and hips which he attributed to twenty years of "walking funny" because of his arthritic ankles. AR 32. He blames an inability to concentrate and deal with his phone customers on the pain caused by his physical condition. AR 33. The pain and swelling in his legs progresses throughout the day. *Id.* As the day progresses, his ankle locks up and he becomes "peg-legged." AR 34. Now he has the ability to lie down and elevate his legs as needed. AR 43. He takes 18-20 ibuprofen on a bad day. AR 34. He has tried prescription medication but he does not like feeling "looped." *Id.* At the time of the hearing, he was not taking prescription medication for his high blood pressure, but he had quit smoking. AR 44. He'd last seen his family physician (Dr. Adam-Burchill) about a month before the hearing. *Id.* He saw her because she was most familiar with his condition and he asked her for an evaluation. *Id.* Dr. Adam-Burchill sent him to a pain specialist at one time, but Monlux could not remember the name of the specialist. AR 45. Monlux was not satisfied with the treatment offered by the pain specialist because he did not like being "high." AR 46. Dr. Adam-Burchill recommended losing weight, but she did not specifically relate the recommendation to helping with his mobility or aggravating his

---

[23]Monlux explained his boss allowed him to elevate his legs at work, but only to eighteen inches which did not do any good. AR 32. In order to provide any relief, he needed to elevate his legs three feet. That would require him to put his feet on top of the desk--not acceptable in a work environment. *Id.*

leg or ankle problems. AR 46.

Monlux estimated he can sit for about twenty minutes before his legs and feet begin to hurt. AR 35. He can stand for about ten minutes before he needs to sit down. *Id.* His balance is not good. He explained that is someone approached him and "popped him a little bit" as if to say "how are you doing?" he would more than likely fall over because his weak ankles and locked left leg make it impossible for him to catch himself. AR 35-36. He does not use any type of assistive device to walk. AR 36. He walks as little as possible. AR 37. He can walk a city block but it would take him much longer than a normal person. Walking was part of the reason he decided to quit his job, because even though he had a handicap parking permit, at the end of the day even with a sit-down job he "hobbled" out of the building. AR 38. For the last few years he worked, he burned up all of his FMLA leave because of his ankle issues. AR 39.

Monlux lives alone in a ground floor apartment. AR 41. Sometimes he gets his own groceries but sometimes his son gets them for him. *Id.* He is able to take care of his personal hygiene but bathing and dressing are difficult and take him a long time because of his balance issues. AR 40. His activities are limited to taking care of his personal needs. He does not participate in outside activities. AR 41. He last golfed three years before the hearing. AR 47. A lot of times his step-daughter or his sister cook for him. AR 47. His ability to be independent is "deteriorating." *Id.*

### Vocational Testimony

Dr. William Tucker (VE) testified regarding Monlux's vocational abilities. AR 49. He completed a past relevant work summary (AR 170) which indicated Monlux's past relevant work consisted of a collection clerk (skilled sedentary work, light duty as described by Monlux); a telephone solicitor (semi-skilled, sedentary work); a credit card clerk (semi-skilled, sedentary work); a mail sorter (unskilled, light duty work); and a mail carrier (semi-skilled, medium duty work, heavy duty as described by plaintiff). The ALJ asked the VE three hypothetical questions. The first hypothetical question asked the VE to assume a person under fifty, with Monlux's education and

16

work experience who had the same work-related limitations as described by Monlux in his testimony "What if anything is the vocational effect of his testimony when you look at his past work?" AR 51. The ALJ indicated Monlux would be incapable of his past relevant work or any other full-time work. AR 52.

The ALJ's second hypothetical asked the VE to assume a person of under fifty, Monlux's education and work experience, but to assume the physical capabilities as outlined in Dr. Erickson's RFC dated June 15, 2007: Monlux could lift up to 20 pounds occasionally, 10 pounds frequently, stand/walk/ 2 hours out of an 8 hour day with normal breaks, and sit for 6 hours out of an 8 hour work day with normal breaks, push/pull activities were limited in the lower extremities, postural activities were limited to occasional except no climbing of ladders, ropes or scaffolds, stooping was limited to frequently, with no manipulative of visual limitations. Additionally, Monlux was to avoid concentrated exposure to vibration and moderate exposure to hazardous working conditions (sedentary work). Given this hypothetical, the VE opined Monlux could return to his past relevant work as a telephone solicitor, a credit card clerk, and a collection clerk. AR 53.

The ALJ's third hypothetical asked the VE to assume the physical limitations as assigned by Dr. Adam-Burchill's opinion dated September 10, 2008 AR 219. Dr. Adam-Burchill opined that Monlux's pain and other symptoms would frequently interfere with his ability to perform simple work tasks, that he could sit for 2 hours before needing to get up, that he could stand for 15 minutes before needing to sit down, that he could sit for 2 hours out of an 8 hour work day and that he could stand/walk for less than 2 hours out of an 8 hour work day and that he was capable carrying less than 10 pounds occasionally in a competitive work environment. *Id.* Given those restrictions, the ALJ answered his own hypothetical and indicated the law presumes there are no jobs available that could accommodate an ability to work less than an eight hour day. AR 54.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf,* 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. " *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

Additionally, when the Appeals Council has considered new and material evidence and declined review, the Court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding,

on the reviewing court. *Smith*, 982 F.2d at 311.

## B.     The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:**   Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental

impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 404.1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW) as defined by 20 CFR 404.1560(b)(1). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.  Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

## D.  The ALJ's Decision

The ALJ issued a nine page, single-spaced decision on December 24, 2008. The ALJ's decision discussed steps one through four of the above five-step procedure.

At step one, the ALJ found Monlux had not engaged in substantial gainful activity since his alleged onset date (November 30, 2006). AR 17.

At step two, the ALJ found Monlux has the following severe impairments: traumatic bilateral

calcaneal fractures of the ankles more than 18 years ago with resulting diagnosis of traumatic arthritis; history of left tibia/fibia (sic) fracture in 2004 status post ORIF; tobacco abuse; severe degenerative changes of the left ankle and calcaneal-talus joint and suggestion of severe degenerative changes between the talus and calcaneus in the right ankle. AR 17. The ALJ found that Monlux's hypertension was controlled and was a non-severe impairment that resulted in no work-related limitations. *Id.* He also found that Monlux's "reported history of heavy drinking" was not a current or ongoing problem and not a medically determinable impairment. AR 17-18.

At step three, the ALJ indicated he considered whether Monlux is disabled under Listings 1.02 (Major dysfunction of a joint) and/or 1.06 (fracture of the femur, tibia, pelvis or one ore more of the tarsal bones). The ALJ found, however " [t]here is no evidence of an inability to ambulate effectively as required in 1.02A. There is no evidence of a 'solid union not evidence' and the inability to ambulate effectively as required by listing 1.06. Further, no treating or examining source has opined that the claimant's impairments meet or medically equal any listing." AR 18. As such, the ALJ found that Monlux does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Supbart P, Appendix 1. *Id.*

At step four, the ALJ found Monlux has the residual functional capacity (RFC) to perform light/sedentary work with the following limitations: He can lift/carry 20 pounds occasionally and 10 pounds frequently, sit 6 hours out of an 8 hour workday, stand/walk 2 hours out of an 8 hour work day; limited ability to use foot pedals; occasional postural activities except no climbing ladders, ropes or scaffolds, frequent stooping, no visual, manipulative or communicative limitations, avoid concentrated exposure to vibration, and avoid moderate exposure to hazardous work conditions. AR 18. The ALJ adopted the RFC as defined by the non-examining, non-treating DDS physician (Dr. Erickson) (AR 29) and rejected the opinions of Monlux's treating physician (Dr. Adam-Burchill ) and the consulting physician (Dr. Geier) regarding Monlux's residual functional capacity. *Id.* The ALJ found Monlux's statements concerning the intensity, persistence, and limiting effects of his symptoms are not credible to the extent they are inconsistent with the residual functional capacity

assessment as assigned by the non-examining, non-treating DDS physician. AR 19. The ALJ stated "the above residual functional capacity . . .is given great weight because it is supported by the objective medical evidence, the lack of ongoing medical care since December 2006, the lack of evidence of pain medication prescriptions, the claimant's activities of daily living, the lack of evidence of a prescribed cane or assistive device, the lack of observation by a medical source that the claimant uses a cane or an assistive device." AR 19.

The ALJ gave the treating physician (Dr. Adam-Burchill's) opinion "little weight." AR 20. The ALJ explained that Dr. Adam-Burchill's treatment notes did not support Monlux's pain complaints or the limitations she assigned to his work ability. *Id.* The ALJ also noted that neither Dr. Adam-Burchill nor any other physician had prescribed a cane or other ambulatory device for Monlux. *Id.* The ALJ also rejected Dr. Adam-Burchill's opinion because "there is no function-by function assessment, she is not a vocational expert, and does not appear familiar with Social Security Rules and Regulations." AR 21.

The ALJ also partially rejected the opinion of the consulting physician, Dr. Geier, who opined Monlux is "unable to work for 8 hours without significant pain." AR 21. The ALJ noted Dr. Geier's opinion that Monlux could not do any job that involved standing for long periods of time and that his ability to stoop, climb and kneel were significantly impaired secondary to decreased range of motion. *Id.* The ALJ gave this portion of Dr. Geier's opinion "great weight to the extent it is consistent with the above residual functional capacity and the objective evidence of record." *Id.* He recited Dr. Geier's findings upon her objective physical examination and stated "the undersigned finds that this objective examination supports the above residual functional capacity." AR 22. He rejected the opinion Dr. Geier formed based upon her examination, however: "In sedentary work, the claimant should be able to perform work 8 hours a day. Thus, the consultative examiner's opinion that he cannot is given no weight because the consultative examiner is not a vocational expert and appears to rely heavily on the claimant's subjective complaints, which are not entirely credible." AR 22.

The ALJ determined Monlux is capable of performing his past relevant work as a collection clerk and a telephone solicitor. "This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565)." AR 22. Because the ALJ determined at Step Four that Monlux remains capable of performing his past relevant work, the ALJ did not proceed to Step Five of the analysis. The ALJ decided that Monlux is "not disabled" under the Social Security Act. AR 22.

### E. The Parties' Positions

Monlux assigns four points of error: (1) the Commissioner failed to acknowledge Monlux's obesity as a medically determinable impairment, which should have been considered in formulating his residual functional capacity (RFC); (2) The Commissioner's determination of Monlux's RFC is not supported by substantial evidence on the record as a whole;[24] (3) the Commissioner failed to properly analyze Monlux's mental impairment; (4) the Commissioner failed to properly evaluate Monlux's subjective pain complaints (the credibility determination). The Commissioner asserts his decision is supported by substantial evidence on the record and should be affirmed.

### F. Analysis

Monlux asserts the Commissioner made four mistakes: (1) He failed to acknowledge Monlux's obesity as a medically determinable impairment which should have been considered in formulating his RFC; (2) His formulation of Monlux's RFC is not supported by substantial evidence on the record as a whole; (3) He failed to properly consider Monlux's mental impairment; and (4) he failed to properly evaluate Monlux's credibility. These assertions will be examined in turn.

### 1. The Commissioner's Failure to Consider Monlux's Obesity

Monlux's first assignment of error is that the ALJ's failure to acknowledge his obesity as a medically determinable impairment infected the outcome of the entire process because all impairments, even those that are not severe, must be considered when formulating a Social Security

---

[24]This argument contains sub-parts.

23

claimant's RFC.  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogation on other grounds recognized in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000).  At step two of the decision, the ALJ noted Monlux's severe impairments of traumatic bilateral calcaneal fractures of the ankles more than 18 years ago with resulting diagnosis of traumatic arthritis; history of left tibia/fibia (sic) fracture in 2004 status post ORIF; tobacco abuse; severe degenerative changes of the left ankle and calcaneal-talus joint and suggestion of severe degenerative changes between the talus and calcaneus in the right ankle.  AR 24.  The ALJ also noted Monlux's non-severe impairment of hypertension.  *Id.*  The ALJ noted Monlux had a history of alcohol abuse but found it was not a medically determinable impairment.  In his decision, the ALJ noted Monlux's height and weight (68 ½ inches tall and 293 pounds) "indicat[es]obesity." AR 19.  The ALJ did not, however, acknowledge Monlux's obesity as a medically determinable impairment--severe or non-severe.  Obesity was therefore not considered at Step Four to formulate Monlux's RFC.

The ALJ questioned Monlux about his weight during the hearing and about whether Monlux's physicians had characterized his weight "either being a medical problem on its own or aggravating the ankle, leg, arthritis?"  AR 46.  Monlux acknowledged his weight had an impact on his ankle problems, but told the ALJ his physicians had never explicitly connected his weight and his mobility issues.  *Id.*   The medical records reveal that Monlux's treating physician (Dr. Adam-Burchill) and the consulting physician (Dr. Geier) both noted Monlux was obese.  AR 181, 182, 183, 194.  His treating physician noted Monlux is "unable to exercise much because of his history of leg fractures" (AR 184)  but nevertheless she "encouraged him strongly to consider his options" AR 183.  In August, 2006 Dr. Adam-Burchill advised that "at this time, it is weight loss and blood pressure control that is imperative."  *Id.*  Two months later she again noted his obesity and "strongly encouraged dietary modification, exercise and weight loss." AR 182.   Both the treating physician and the consulting physician, therefore, explicitly recognized Monlux's obesity as a medically determinable impairment.   The ALJ, however, inexplicably failed to do so in his evaluation of Monlux's disability claim.  "[T]he ALJ must not substitute his opinions for those of the physician." *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).

Before October 25, 1999, obesity was a "listed" impairment under Appendix 1, Subpart P, Part 404. After obesity was eliminated from the Listings, the Social Security Administration issued SSR 02-01p to guide ALJs in their evaluation of disability when the claimant is obese. Social Security Ruling 02-01p instructs that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id. See also Webster v. Commissioner of Social Security*, 2008 WL 207578 (W.D. Mich.) at *4. The ruling does not, however, mandate a particular mode of analysis. *Id.*

The language contained in the Social Security Regulations, however is mandatory. In this case, the ALJ considered whether Monlux is disabled under Listings contained within Appendix 1, Subpart P, Part 404 Sec. 1.00 (Musculoskeletal System). *See* AR 18. Appendix 1, Subpart P, Part 404. Sec. 1.Q. provides:

> Q.    Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators *must* consider any additional and cumulative effects of obesity.

(Emphasis added). "Failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal." *Spicer v. Barnhart*, 64 Fed. Appx. 173, 178 (10th Cir. 2003). *See also, Washington v. Shalala*, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is grounds for reversal. We note that the ALJ failed to consider the Plaintiff's vision loss in conducting the step-four inquiry. This failure, alone, would be grounds for reversal."). Monlux's severe impairments include bilateral ankle/heel fractures, traumatic arthritis and degenerative changes of the lower extremities. The treating and consulting physician both noted that Monlux is obese. The Social Security Regulations (along with common sense) require the Commissioner to consider Monlux's obesity when assessing his claim at all steps of the sequential evaluation process, including when assessing an his residual functional capacity. *See also Reeder*

*v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (reversing and remanding denial of benefits because ALJ ignored record evidence of claimant's obesity and arthritis; ALJ did not explicitly consider combined effect and "the ALJ is not free to ignore medical evidence but rather must consider the whole record."); *Thompson v. Bowen,* 850 F.2d 346, 350 (8th Cir. 1988) ("While obesity is not a per se impairment, on remand, the ALJ should consider Thompson's obesity as an impairment that may affect her disability status.") (citation omitted). The ALJ's failure to consider Monlux's obesity throughout the sequential evaluation process constitutes reversible error.

### 2.    The Commissioner's Determination of Monlux's RFC

Monlux asserts the Commissioner erred in determining his RFC in two ways: failing to properly evaluate the medical evidence and failing to properly phrase hypothetical questions to the vocational expert (VE).    Monlux asserts the ALJ erred by rejecting the opinions of Dr. Adam-Burchill and Dr. Geier, the treating and consulting physicians in favor of the RFC formulated Dr. Erickson, the non-examining, non-treating physician.    He further asserts that the hypothetical formulated by the ALJ, and upon which the VE relied was not supported by any medical opinion, including the one purportedly adopted by the ALJ.

Monlux asserts the ALJ erred by failing to afford Dr. Adam-Burchill and Dr. Geier's opinions controlling weight.    "[A] treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician, but such deference is not always justified.    When the treating physician's opinion consists of nothing more than conclusory statements, the opinion is not entitled to greater weight than any other physician's opinion." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991).    To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).    When the treating physician's conclusions are based in part on subjective complaints which are properly found to be not credible by the ALJ, the ALJ may reject those conclusions upon which the physician based his findings on the subjective complaints. *Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996).

The Commissioner is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Id.* "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003) (citations omitted). "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." *Id.* Finally, "opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." *Bowman v. Barnhart*, 310 F.3d 1080, 1085, (8th Cir. 2002). Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted). Also, 20 C.F.R. § 404.1527(d) provides the factors to consider for assigning weight to medical opinions. That regulation provides:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>
> (I) Length of treatment relationship and frequency of examination.

Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Monlux asserts that if the ALJ construed Dr. Adam-Burchill's notes as unclear or inadequate to support her opinions, or as including opinions on issues reserved for the Commissioner, the ALJ had a duty to recontact her to clarify. SSR 96-5p; *Coleman v. Astrue,* 498 F.3d 767, 770 (8th Cir.

2007). [25] Monlux asserts 20 C.F.R. § 404.1512(e) applies:

> **(e)** Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following action.
>
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.
>
> (2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

On September 8, 2008, Dr. Paula Adam-Burchill, Monlux's treating physician, examined Monlux. AR 226. His chief complaint was bilateral leg pain. She recited his history of bilateral heel and ankle fractures and multiple surgeries. She noted no swelling[26] but limited range of motion bilaterally, especially on the left. Dr. Adam-Burchill wrote a letter explaining Monlux had "many years ago" sustained a traumatic fall that left him with multiple fractures of the lower extremities and resultant surgeries. AR 217. She further explained that although Monlux had worked for the past 20 years he was "now finding it difficult to take are of his daily needs due to excessive arthritic changes

---

[25]Both SSR 96-5p and *Coleman* are based on the duty to recontact the treating physician. The Regulations have now eliminated that duty with the revision of 20 C.F.R. § 404.1512. The version of § 404.1512 effective as of March 26, 2012, has been re-written and the former section (e) has been omitted. Section 404.1512(e) as it appears above applied as of the date of Monlux's hearing and the date of the ALJ's decision. *See* https://www.federalregister.gov/articles/2012/02/23/2012-4177/how-we-collect-and-consider-evidence-of-disability#h-4

[26]Monlux explained during the hearing that after he quit his job in 2006, he had the ability to minimize the swelling of his legs/ankles by elevating his legs during the day. AR 43.

and immobility of his extremities." She concluded by telling the reader "it would be a hardship for [Monlux] to continue to be employed as simply walking any distance is difficult at best." *Id.* Two days later Adam-Burchill completed a questionnaire in which she limited his sitting to a total of 2 hours out of an 8 hour day, and standing/walking to less than 2 hours out of an 8 hour day. AR 219. She also indicated that pain or other symptoms would frequently interfere with his ability to perform simple work tasks. *Id.* The ALJ assigned Dr. Adam-Burchill's opinion "little weight." AR 29. The ALJ cited three reasons for rejecting Dr. Adam-Burchill's opinion: (1) the lack of treatment records after Monlux's date of onset (AR 20); (2) her records do not support her opinion of disability (AR 20); and (3) Dr. Adam-Burchill "is not a vocational expert and does not appear familiar with Social Security Rules and Regulations" (AR 21).

Next, the ALJ discussed the RFC assigned by consulting physician Dr. Geier. On May 7, 2007, Dr. Geier examined Monlux and opined his bilateral ankle pain and significantly decreased range of motion affected his ability to function in daily life "significantly." AR 194. She ordered x-rays of his ankles and conducted a physical exam. The x-rays revealed "deformity and severe degenerative change left ankle . . .residual deformity in the right calcaneus with severe degenerative change between the talus and calcaneus." AR 195. Dr. Geier's physical exam revealed no dorsiflexion in either foot and an inability to invert or evert or pronate or supinate either foot. Monlux was unable to perform most of the stress tests because of his limited range of motion. AR 194. She concluded "currently [Monlux] is unable to work for 8 hours without significant pain." She also opined he "certainly cannot do any jobs that involve standing for long periods of time. The ability to stoop, climb and kneel are significantly impaired secondary to the decreased range of motion. He is able to see, hear and speak easily. Travel would be questionable depending on how far he as to walk. . ." The ALJ accepted Dr. Geier's opinion "to the extent it is consistent with the above residual functional capacity and the objective evidence of record. " The ALJ gave Dr. Geier's opinion that Monlux could not work an eight hour workday "no weight" however, because "in sedentary work, the claimant should be able to perform work 8 hours a day." AR 22. In support of his conclusion, the ALJ stated "the consultative examiner is not a vocational expert and appears to rely heavily on claimant's subjective complaints, which are not entirely credible." *Id.*

The ALJ must "always give good reasons" for the weight afforded to a treating physician's evaluation. *Reed v. Barnhart*, 399 F.3d 917, 921 (8ᵗʰ Cir. 2005). Conclusory reasons for rejecting the treating physician's opinion, however, are insufficient. *Id.* The ALJ may reject a treating physician's opinions outright "only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." *McGoffin v. Barnhart*, 288 F.3d 1248, 1251 (10ᵗʰ Cir. 2002).

The ALJ's reasons for rejecting the opinions of Drs. Adam-Burchill and Geier in this case are conclusory. First, the ALJ cited as a reason for rejecting the opinion of Dr. Adam-Burchill Monlux's failure to seek ongoing medical care since his date of onset,[27] the lack of objective clinical or physical findings noted in the records to support her finding of disability and that the treatment notes did not support Monlux's pain complaints. The medical records, while not abundant, are supportive of Dr. Adam-Burchill's opinion. In July, 2006 Monlux reported "a fair amount of pain" and "lower extremity swelling." AR 185. He also complained of leg pain during his August, 2006 visit to Dr. Adam-Burchill when he requested that she complete FMLA paperwork for his lower

---

[27]The ALJ particularly critical of Monlux's failure to seek medical treatment between his onset date and the date when he requested Dr. Adam-Burchill to complete the RFC evaluation. The ALJ stated "[t]here is no evidence that Dr. Adam-Burchill continued her treatment relationship with the claimant after December, 2006. The claimant had time to solicit and receive this opinion from Dr. Adam-Burchill so his failure to submit medical records for 2007 and 2008 from the same provider impact negatively on his credibility." AR 19-20.

Monlux, however was unemployed during that time and explained to the ALJ that he had been surviving with the assistance of his sister and from small 401K he'd cashed out. AR 42. Further, SSR 96-7p provides that where a claimant fails to pursue medical treatment for an impairment, an ALJ "*must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record that may explain the infrequent or irregular medical visits or failure to seek medical treatment.*" (Emphasis added). *See also Watkins v. Astrue*, 414 Fed. Appx. 894, 898 (8ᵗʰ Cir. 2011) (Colloton, concurring). The ALJ did not ask Monlux why he did not visit his doctor more frequently, not did the ALJ inquire of any of Monlux's doctors whether there was any medical treatment available which might more effectively alleviate his symptoms.

The ALJ therefore improperly drew inferences from Monlux's infrequent treatment.

extremity condition. AR 183-184. During the August 2006 visit Dr. Adam-Burchill noted Monlux's lower extremity edema was "much improved on the HCTZ" and she agreed to complete the FMLA paperwork so he would not be penalized if his condition caused him to miss work. AR 183. In October, 2006 Dr. Adam-Burchill noted that Monlux's ankle fractures had left him "somewhat disabled." AR 182. In December, 2006 Monlux returned to Dr. Adam-Burchill to discuss his ankles. AR 181. Dr. Adam-Burchill's physical exam revealed Monlux's abdomen was obese and his lower extremities showed skin changes. He had plates in both ankles. He had contracture type deformities of the foot because of his limited and lack of mobility of the ankle. His dorsiflexion and plantar flexion were minimal. Edema (swelling) was present. AR 181. She continued his blood pressure medication and increased his diuretic. After this meeting, Dr. Adam-Burchill's assessment was "bilateral calcaneal fractures with resultant disability." She commented that Monlux had quit his job "because he is just unable to keep up. He has applied for disability, which I think is probably the only way he will be able to make it through." *Id.* Finally, Monlux told the ALJ of his visit to Dr. Adam-Burchill shortly before the administrative hearing but the office notes were not in the administrative record.[28] Dr. Adam-Burchill's objective findings are supportive of her conclusions.

"Statements that a claimant [cannot] be gainfully employed are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner. A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) (citations omitted, punctuation altered). It is error to completely disregard a treating physician's opinion about disability, however, when the opinion is "part of a larger medical record" which supports the treating physician's conclusion and when the only opposing evidence is supplied by a non-treating, non examining DDS physician. *Cox v. Barnhart*, 345 F.3d 606, 609-10 (8th Cir. 2003). Further, Dr. Adam-Burchill completed an RFC questionnaire in September, 2008, which she specified how many hours in an 8 hour work day Monlux could sit, stand, and walk. AR 219.

---

[28]These records appear at AR 222-229. They were considered by the Appeals Council on its second review.

"[M]edical opinions on how much work a claimant can do are not only allowed, but encouraged." *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995). Dr. Adam-Burchill's comments about Monlux's disability in her treatment notes do not negate the RFC form completed by her, which are supported by her own and other medical records[29] available to the ALJ.

The ALJ also rejected the opinion of the consulting physician, Dr. Geier. The ALJ accepted Dr. Geier's objective physical findings, but rejected her conclusion that Monlux is physically unable to work an eight hour work day because the ALJ concluded "in sedentary work, the claimant should be able to perform work 8 hours a day." AR 22. "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). *See also Dixon v. Barnhart*, 324 F.3d 997, 1002 (8th Cir. 2003). Dr. Geier's physical examination and the x-ray reports contained in her records are likewise consistent with of Dr. Adam-Burchill's September, 2008 RFC assessment. Nonetheless, the ALJ rejected Dr. Geier's opinion because "the consultative examiner is not a vocational expert and appears to rely heavily on the claimant's subjective complaints, which are not entirely credible." Dr. Geier, however, did not provide an improper vocational opinion. She performed a an extensive physical examination in which she described in great detail Monlux's limited range of motion. She likewise ordered x-rays which showed extremely arthritic and degenerated bilateral lower extremity joints, both of which are consistent with her opinion and Monlux's subjective complaints.

Finally, the only evidence which contradicted the findings of the treating and consulting physicians was the RFC assessment by the DDS physician who neither treated nor examined Monlux. The Eighth Circuit has repeatedly held that "opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002). The ALJ had a duty to recontact the treating/consulting physician for clarification of their opinions, if any was necessary. *Id.* (ALJ obligated to contact treating physician for "additional evidence or clarification."); 20 C.F.R. § 404.1512(e) (explaining that when the information received from a treating physician is inadequate, the Commissioner will recontact for

---

[29]*See e.g.* x-ray report dated 4/25/07, AR 195.

clarification). The ALJ's assignment of "little weight" or "no weight" to the opinion of Monlux's treating physicians and consulting physicians, while assigning "great weight" to the opinion of a non-examining, non-treating physician is not supported by substantial evidence.

Next, Monlux asserts his RFC determination is not supported by substantial evidence because the ALJ's hypothetical to the VE omitted important facts. Specifically, Monlux asserts the ALJ (1) mis-stated Monlux's age and; (2) failed to incorporate restrictions which were imposed by the physician whose medical opinion the ALJ adopted for purposes of formulating the RFC.

Age is considered when determining a claimant's ability to adjust to other work in Step 5 of the analysis. *See* 20 C.F.R. § 404.1520. Monlux concedes that because the denial of benefits was made at Step Four of the analysis it is less relevant than it would have been had the denial been made at Step Five. In his hypothetical to the VE, the ALJ mistakenly stated that on the day of the administrative hearing Monlux was under fifty when in fact he was fifty-two. For purposes of deciding whether he would be able to adjust to other work, therefore, he was "approaching advanced age" pursuant to Subpart P, App.2, Sec. 201(g). If persons approaching advanced age are unable to return to their past relevant work, are limited to sedentary work, and have no transferrable skills, " a finding of disabled ordinarily obtains." *Id.* Because the ALJ in this instance made his disability finding at Step Four, however, his mis-statement about Monlux's age is hard to quantify.

It has already been determined that the ALJ's decision to reject the opinions of the treating and consulting physicians in favor of the opinion offered by a non-treating, non-examining physician is not supported by substantial evidence. Any discussion of the ALJ's failure to include in the hypothetical a restriction imposed by a physician whose opinion is not supported by substantial evidence would therefore be purely academic.

### 3.    The Commissioner's Failure to Analyze Monlux's Mental Impairment.

Next, Monlux asserts the Commissioner erred by failing to properly consider whether he suffers from a medically determinable mental impairment and if so, the degree of functional

limitations which result from any such impairment. Monlux asserts the ALJ should have implemented the special procedure mandated by 20 C.F.R. § 404.1520(a)–the psychiatric review technique.

Monlux acknowledges that he did not identify any mental limitations in his application. *See* Brief (Doc. 13) at p. 34. "The ALJ's duty to investigate . . does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record." *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995).[30] *See also Nielson v. Barnhart*, 88 Fed. Appx. 145, 147 (8th Cir. 2004) (ALJ did not err by failing to complete PRTF when claimant failed to allege mental impairment until hearing and never sought treatment for depression).[31]

Monlux claims, however, that the ALJ should have *sua sponte* recognized that he suffered from a medically determinable mental impairment and *sua sponte* performed the psychiatric review technique. The regulation provides that the use of the psychiatric review technique begins with evaluating " pertinent symptoms, signs and laboratory findings to determine whether you have a medically determinable mental impairment. See 20 C.F.R. § 404.1508 . . ."[32]

Section 404.1508 requires in relevant part:

> Your impairment must result from anatomical, physiological or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by

---

[30]In *Leggett*, as here, the claimant never alleged a mental impairment until the appellate stage of his claim. *Id.*

[31]Citation of unpublished opinions is governed by Rule of Appellate Procedure 32.1. Eighth Circuit Local Rule 32.1A provides that unpublished opinions issued before January 1, 2007 generally should not be cited but may be cited if they have persuasive value on a material issue and no published opinion of this circuit or another would serve as well. *Nielson* was decided before January 1, 2007 and is cited here because of its persuasive value, and because no other Eighth Circuit authority has been found regarding an ALJ's duty to *sua sponte* perform the PRTF if the claimant has not listed a mental impairment on his application nor sought treatment for a mental impairment.

[32]*See* 20 C.F.R. § 404.1520b(1).

your statement of symptoms . . .

That Monlux stated during the hearing or in his disability reports it is "hard to get going mentally" or that "pain makes me depressed" is a statement of symptoms, not medical evidence which establishes a mental impairment. Monlux sought treatment for pain. He did not seek treatment for depression or any other mental impairment. None of Monlux's treating or consulting physicians diagnosed a mental impairment or referred Monlux to any other medical or mental health provider for further evaluation of a mental impairment. "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). The Commissioner did not err, therefore, by failing to analyze Monlux's mental impairment and/or by failing to complete the psychiatric review technique analysis.

### 4. The Commissioner's Evaluation of the Monlux's Subjective Complaints (The Credibility Determination)

Monlux asserts the ALJ did not appropriately apply the *Polaski* factors to evaluate his subjective complaints when determining his residual functional capacity. "Where adequately explained and supported, credibility findings are for the ALJ to make." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). If the ALJ's credibility determination is supported by substantial evidence, that the reviewing judge may have decided differently is not justification for reversal. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). The ALJ's credibility finding must only be supported by "minimally articulate reasons for crediting or rejecting evidence of disability" *Id.* This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Ordinarily, credibility determinations are peculiarly for the finder of fact. *Kepler v. Chater*, 68 F.3d 387, 391 (8th Cir. 1995). Findings as to credibility, however, should be closely and affirmatively linked to substantial evidence and "not just a conclusion in the guise of findings." *Id.* The ALJ must articulate specific reasons for questioning the claimant's credibility where subjective pain is a critical issue. *Id.* Thus, the ALJ must make express credibility determinations and set forth

the inconsistencies in the record which cause him to reject the Plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).

When evaluating evidence of pain, the ALJ must consider: (1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) *citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See also* 20 C.F.R. § 1529. The ALJ may not reject a claimant's subjective pain complaints solely because the objective medical evidence does not fully support them. *Polaski* at 1320. The absence of objective evidence is merely one factor to consider. *Id.*

When a Plaintiff claims the ALJ failed to properly consider her subjective pain complaints, the duty of the Court is to ascertain whether the ALJ considered *all* of the evidence relevant to the Plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. *Masterson*, 363 F.3d at 738-39 (emphasis added). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. *Id.*

The ALJ did not cite *Polaski* but he did mention 20 C.F.R. § 404.1529 and indicated he had considered those factors, along with SSR 96-7p. *See* AR 18. The task for the Court, therefore, is to determine whether the ALJ properly considered all the record evidence when determined Monlux's pain complaints "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." AR 19.

> SSR 96-7p instructs:
>
> It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence

in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the statements and the reasons for that weight.

"In rejecting a claimant's complaints of pain as not credible, we expect an ALJ to detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Guiilliams v. Barnhart*, 393F.3d 798, 802 (8ᵗʰ Cir. 2005) (punctuation altered).

In his decision, the ALJ stated he had considered the necessary factors pursuant to 20 C.F.R. § 404.1529 and SSR 96-7p. The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

AR 19. This boilerplate language has been harshly criticized by other courts as "unhelpful, " "opaque," and "meaningless." *See Adams v. Astrue*, 2012 WL 3065299 (N.D. Ill.) at *9. (Citing cases). And it "backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility. More importantly, it fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony." *Id.* (citations omitted, punctuation altered). In this instance, the ALJ did not sufficiently "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Guiilliams v. Barnhart*, 393F.3d 798, 802 (8ᵗʰ Cir. 2005) (punctuation altered).

In the paragraphs preceding and following this conclusion, the ALJ discussed at any length only one of the factors mentioned in 20 C.F.R. § 404.1529 (Monlux's activities of daily living) and did not sufficiently explain how this factor affected the credibility determination. Instead, the ALJ stated

> he reported his personal care takes longer, but he appeared to have no significant difficulty in completing his tasks. He stated he lives alone. He makes his own meals, does his own laundry, some dishes, does yardwork for short periods. He drives a car and shops. He states he goes fishing 3 times a year if he has help. He states he can walk 50 yards before having to rest for a couple of minutes. These activities of daily living are consistent with the above residual functional capacity.

The Eight Circuit has repeatedly chastised the Social Security Administration, however, for equating an ability to feed and bathe oneself with the capability to perform substantial, gainful activity.

> In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses. SSR 85-16. SSR 85-16 further specifies that 'consideration should be given to . . . the quality of daily activities . . [and the] ability to sustain activities, interests, and relate to others *over a period of time* ' and that the 'frequency, appropriateness, and independence of the activities must also be considered.'
>
> After mentioning several of [the claimant's] activities such as fixing meals, watching movies, checking the mail, and doing laundry, the ALJ noted that [the claimant's] 'ability to perform them to any degree is inconsistent with her allegations of constant, debilitating symptoms.' . . . [Claimant's] testimony about her symptoms hardly seems inconsistent with her ability to perform such routine and simple daily living activities 'to any degree.' Moreover, it is well-settled that a 'claimant need not prove she is bedridden or completely helpless to be found disabled.'
>
> [T]his court has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work. *How many times must we give instructions that watching television, visiting friends and going to church do not indicate that a claimant is able to work full time in our competitive economy? .. The ALJ's failure to consider the quality, frequency and independence of these activities . . . render suspect the use of these activities as probative evidence of [the claimant's] ability to work.* Since a claimant need not prove she is bedridden or completely helpless to be found disabled, the import of [the claimant's] ability to carry out daily activities must be assessed in light of the record supported limitations on her ability to perform real world work.

*Reed v. Barnhart*, 399 F.3d 917, 922-23 (8th Cir. 2005) (citations omitted, punctuation altered, emphasis added). Similarly, that Monlux is able to (slowly) dress and bathe himself, occasionally shop for groceries, and go fishing three time per year if someone assists him "provides little or no support for the finding that [he] can perform full-time competitive work." *Id.* at 923. For this reason as well, the Commissioner's credibility finding is not supported by substantial evidence.

## CONCLUSION

For the reasons more thoroughly explained above, it is respectfully recommended that the Plaintiff's Motion for Summary Judgment (Doc. 11) be GRANTED, and that the Commissioner's denial of benefits be REVERSED and remanded with directions to order the Commissioner to award benefits to Monlux in the amount required under applicable statutes and regulations.

The Commissioner's denial of benefits is not supported by substantial evidence in the record. The Plaintiff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. *Id., Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998).

Monlux's request for benefits has been pending for six years. The Appeals Council has already reviewed it twice. Both Monlux's treating physician and the consulting physician to whom the Social Security Administration referred him for evaluation issued functional capacity assessments indicating he is not capable of full-time work. The record "overwhelmingly supports" his claim for benefits. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for an immediate award of benefits pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this _2/_ day of November, 2012.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _____, Deputy